IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Ross Development Corporation, | ) | C/A No. 2:08-3672-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **AMENDED ORDER AND OPINION** |
| Fireman's Fund Insurance Company, | ) | |
| United States Fire Insurance Company, | ) | |
| and PCS Nitrogen, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| PCS Nitrogen, Inc., | ) | |
| | ) | |
| Cross-Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Fireman's Fund Insurance Company and | ) | |
| United States Fire Insurance Company, | ) | |
| | ) | |
| Cross-Defendants. | ) | |
| _____ | ) | |

This case arises out of the clean-up and remediation of the Columbia Nitrogen Site ("the

Site"), a 43-acre parcel of land in Charleston, South Carolina, pursuant to the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). On October

15, 2008, Ross Development Corporation ("Ross") filed an amended complaint in the Court of

Common Pleas for the County of Charleston, South Carolina, against Fireman's Fund Insurance

Company ("FFIC"), United States Fire Insurance Company ("USFIC"), and PCS Nitrogen, Inc.

("PCS"). ECF No. 1-2 at 8-13. Ross seeks a declaration that various FFIC and USFIC insurance

policies covering periods between 1972 and 1992 provide coverage for its liability in *Ashley II of*

*Charleston, LLC v. PCS Nitrogen, Inc.*, No. 2:05-2782 (D.S.C.) ("*Ashley II*") and in two related cases. Ross also alleges that FFIC and USFIC have breached their contractual duty to defend by refusing to provide a defense in these cases. On November 3, 2008, FFIC removed the action to this court. ECF No. 1.

On August 29, 2011, PCS filed a cross-claim against FFIC and USFIC, seeking to establish coverage under Ross's policies because PCS is a judgment creditor of Ross. ECF No. 120. PCS seeks a declaration that "one or more FFIC and USFIC Policies afford coverage for the judgment obtained by PCS against Ross in the *Ashley II* litigation, and that FFIC and USFIC have an obligation to pay PCS the amounts pursuant to such policies." *Id.* at 6. PCS also alleges that FFIC and USFIC breached one or more insurance contracts issued to Ross by refusing to defend and indemnify Ross in *Ashley II* and in two related cases. *Id.* at 6-8. On September 26, 2011, Ross filed a second amended complaint against FFIC, USFIC, and PCS. ECF No. 125. Before the court are nine motions for summary judgment or partial summary judgment filed by the parties.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when a moving party has shown "[that] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The evidence presents a genuine issue of material fact if a "reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The facts and any inferences drawn from the facts should be viewed in the light most

favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The party seeking summary judgment bears the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Id.*

## DISCUSSION

**I.**     **Insurance Coverage for Ross's Liability in *Ashley II***

FFIC moves for summary judgment on the ground that the pollution exclusions in its policies bar coverage for Ross's claims. In response, Ross argues that property damage arising from its placement of pyrite slag in the ground at the Site and from a 1963 fire does not fall within one or more of the pollution exclusions, and that its liability in *Ashley II* is based on this property damage.

    **A.**     **Background**

The following facts are taken from this court's second amended findings of fact in *Ashley II*, filed May 27, 2011. *Ashley II*, No. 2:05-2782 (D.S.C.) (ECF No. 627). There are four conditions at the Site that the remediation seeks to correct: arsenic contamination, lead contamination, low pH, and carcinogenic polyaromatic hydrocarbon ("cPAH") contamination. *Id.* at 5. Arsenic and lead contamination are found across the entire Site. *Id.* There are two "hot spots" for cPAHs on the Site. One location is in the southwest corner of the Site and the other is on the Allwaste Parcel. The source of the cPAH contamination was a fire that destroyed a major portion of the acid plant in 1963. *Id.* at 6. The cost of the remediation is directly related to the volume of contaminated soil on the Site. The predominant factors contributing to the cost of the

clean-up are the amount of hazardous materials and the spread of these hazardous materials throughout the Site. *Id.* at 8. The majority of the remediation at the Site is necessary because of arsenic contamination. *Id.* Ross, formerly known as Planters, is the only known Site owner that burned pyrite ore and generated pyrite slag. Pyrite slag is the source of the vast majority of the arsenic and much of the lead contamination at the Site. *Id.* at 12.

**B.    The Pollution Exclusions Applied to Ross's Dumping of Pyrite Slag**

**i.    "Qualified" Pollution Exclusion**

All of the policies issued before 1987 contain a "qualified" pollution exclusion, which provides that the policies do not cover:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*See, e.g.*, ECF No. 208-11 at 4. The South Carolina Supreme Court has held that "sudden" contains no temporal limitation and means only "unexpected." *Greenville County v. Ins. Reserve Fund*, 443 S.E.2d 552, 553 (S.C. 1994). The South Carolina Supreme Court has also held that "property damage caused by pollution arising from ordinary business operations is not covered" in a policy containing the qualified pollution exclusion because such pollution cannot be said to be "unexpected and accidental." *Helena Chemical Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455, 460 (S.C. 2004).

**a.    "Accidental" and "unexpected"**

As an initial matter, there is no dispute that Ross intentionally deposited pyrite slag in the ground at the Site over the course of many years. However, Ross argues that the qualified

pollution exclusion applies only if the policyholder intended or expected that *property damage* from pollution would result from its actions – not merely if the "discharge, dispersal, release or escape" itself was intentional or expected. Ross further argues that it did not expect or intend for property damage to result from its use of the pyrite slag. Ross states that "the phosphate fertilizer industry didn't even know about the possibility of arsenic and lead contamination from the use of pyrite slag until around 1924–more than 18 years after Planters first began using pyrite ore for road beds and in-fill." ECF No. 210 at 22. PCS similarly argues that Ross "[n]ever expected or intended contamination at the Site or to third-party property." ECF No. 208 at 6.

Ross cites *Auto Owners Insurance Co., Inc. v. Newman*, 684 S.E.2d 541, 546 (S.C. 2009), for the proposition that "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." However, this statement was in the context of construing an "intentional acts" policy exclusion that prohibited coverage for "'property damage' expected or intended from the standpoint of the insured." *Id.* The plain language of this exclusion prohibits coverage of intentional acts only if the resulting "property damage" is itself expected or intended. On the other hand, the pollution exclusion bars coverage unless the "discharge, dispersal, release or escape" of pollution – not the "property damage" caused by such a "discharge, dispersal, release or escape" – was accidental or unexpected.

Courts have been virtually unanimous in recognizing this distinction and holding that "sudden and accidental" refers to the discharge of pollutants. *See, e.g., St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1203 (1st Cir. 1994); *Liberty Mut. Ins. Co. v. Triangle Industries, Inc.*, 957 F.2d 1153, 1157 (4th Cir. 1992); *New Castle County v. Hartford*

*Acc. and Indem. Co.*, 933 F.2d 1162, 1199-1203 (3d Cir. 1991). Although the parties have identified no South Carolina authority bearing directly upon the question, this court finds, based on the plain language of the contracts, that "sudden and accidental" clearly and unambiguously refers to the release of pollutants and not to any resulting property damage.

Ross also contends that the placement of the slag was "not the 'release' for which Ross was later held liable" – rather, over time lead and arsenic leached out of the slag, into and through the soil and groundwater, and this was the "release" that caused property damage. ECF No. 210 at 22. Some courts have held, and the parties appear to agree, that "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination in the soil and groundwater." *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 131 (2d Cir. 2006). Accordingly, pollutants leaching out of the pyrite slag into new property, such as groundwater, can cause new "property damage" apart from the original dumping. Even if the original dumping was intentional, it is unlikely that Ross expected or intended for such further "property damage" to occur. Nevertheless, the qualified pollution exclusion bars coverage for any property damage "arising out of" the intentional discharge of pollutants. This later damage, caused by leaching of lead and arsenic from pyrite placed into the ground by Ross, "arises out of" the original intentional dumping.

### b.    "Routine business operations"

FFIC argues that Ross's placement of pyrite slag into the ground occurred in the course of Ross's "routine business operations," as this term is used in *Helena Chemical Co. v. Allianz Underwriters Insurance Co.*, 594 S.E.2d 455 (S.C. 2004), and therefore barred by the qualified

pollution exclusion.  In *Helena Chemical*, the South Carolina Supreme Court considered whether chemical discharges were caused by "routine business operations" only in order to determine whether these discharges were "sudden and accidental."  *See Helena Chemical*, 594 S.E.2d at 460-62.  Because the court finds that Ross's placement of pyrite slag was intentional, it is irrelevant for the purposes of the qualified pollution exclusion whether it occurred during "routine business operations."

<strong>c.     "Pollutant"</strong>

PCS contends that "[w]hen initially produced and placed on the ground as fill or roadbed material, the pyrite slag was not a pollutant, and the lead and arsenic components in the slag were not released and did not cause contamination."  ECF No. 208 at 8.  PCS argues that pyrite slag "is not in and of itself a pollutant," and that "[o]nly components of the slag (lead, arsenic) may become pollutants after the creation of sulfuric acid mobilized those components such that they are capable of leaching into the groundwater."  *Id.* at 9-10.  "It is only when those compounds are separated from the pyrite slag that any pollutants are, in fact, discharged into the environment."  *Id.* at 10.

Although there is no dispute that Ross placed materials containing lead and arsenic, both "pollutants" or "contaminants," into the ground, PCS argues that this did not constitute a discharge of pollutants "into the environment" because the pollutants were contained within the slag and had not yet been "mobilized."  The court finds no justification for such a distinction.  The pyrite slag that Ross put into the ground contained toxic metals and compounds that would, in the normal and natural course of events without any further human action, leach into the soil and ultimately into water sources.  The fact that these pollutants may have escaped from their

"container" slowly rather than immediately has no bearing on whether Ross discharged pollutants into the environment.

### d.    "Waste material"

PCS argues that pyrite slag was a byproduct of Ross's manufacturing process but "was not considered waste during the time period in question" because it had value for use in road construction and stabilization and was "marketable." ECF No. 208 at 6-7 & 20.  PCS argues that the "plain, ordinary, dictionary definition" of "waste" is something "considered to be or discarded as worthless or useless." *Id.* at 20 (citing *Webster's II New College Dictionary* (1995)).

In the court's view, PCS's restrictive interpretation of the term "waste" improperly focuses on whether the pyrite slag had a value for some secondary purpose not directly related to Ross's manufacture of fertilizer.  Many byproducts can be repurposed or recycled and thus have some value in a different context.  This does not mean that the byproduct is not "waste" with respect to the manufacturing process in which it is created.  Webster's Third New International Dictionary defines "waste" as "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation; material not usable for the ordinary or main purpose of manufacture."  As an example of such "waste," the dictionary lists "material rejected during a textile manufacturing process and either recovered for reworking (as yarn) or used usually for wiping dirt and oil from hands and machinery."  This definition more accurately reflects the usage of the word "waste," particularly as applied to a manufacturing byproduct.  The court finds that the term "waste material" unambiguously includes pyrite slag, a byproduct of Ross's fertilizer production suitable only for low-value uses such as filling in low-

lying land and road beds.

### e.    Groundwater contamination

Ross argues that the exclusion does not apply to a "discharge, dispersal, release or escape" of pollutants into groundwater because groundwater is not a "watercourse" or a "body of water." Even if Ross is correct, the exclusion still applies here. Although the pollution ultimately reached the groundwater, it is clear that Ross initially dumped the pyrite slag on land. The exclusion bars coverage for anything "arising out of" this initial pollution, which would bar coverage for any future groundwater contamination resulting from Ross's actions.

The court finds that Ross's placement of pyrite slag into the ground at the Site constitutes a "discharge, dispersal, [or] release" of "toxic chemicals . . . , waste materials . . . or pollutants into or upon land" that was not "sudden and accidental." Accordingly, any coverage for "property damage" arising out of this dumping is barred by the qualified pollution exclusion.

### ii.    "Absolute" Pollution Exclusion (Version 1)

The policies issued between 1987 and 1990 contain an "absolute" pollution exclusion, referred to by the parties as "version 1," which excludes coverage for:

**f.** (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste; [or]

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible . . . .

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or

neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

ECF No. 210-2.[1] Additionally, the policies containing this exclusion also contain an endorsement stating exclusion f.(1)(a) "do[es] not apply to 'bodily injury' or 'property damage' caused by heat, smoke, or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be." ECF No. 210-4.

Ross notes that pyrite slag was used to line road beds and fill in low-lying areas at the Site. Ross argues that because "[t]here is no evidence the pyrite slag was handled, stored, disposed of, processed, or treated as waste," exclusion f.(1)(b) does not apply. ECF No. 210 at 25. As explained above, the pyrite slag generated by Ross as a byproduct of its fertilizer manufacturing operations unambiguously falls into the meaning of the term "waste." Furthermore, the absolute pollution exclusion in fact specifies that waste "includes materials to be recycled, reconditioned or reclaimed"; this clause contradicts the assertion that "waste" must be completely useless or valueless. Also, the fact that Ross disposed of the slag in a manner that provided some tangential benefit does not mean that it was not a "disposal."

The court finds that Ross's placement of pyrite slag into the ground at the Site constitutes the "disposal" of "waste." Accordingly, any coverage for "property damage" arising out of "the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" at the Site is

---

[1]    Both versions of the "absolute" pollution exclusion also include a subsection f.(1)(d). Because FFIC does not contend that this subsection applies, the court does not address it.

barred by version 1 of the "absolute" pollution exclusion.

PCS argues that the contamination giving rise to Ross's liability is caused by "seepage" or "migration" of pollutants to groundwater and marsh waters. Although version 2 of the absolute pollution exclusion contains these terms, version 1 only bars property damage arising out of the "discharge, dispersal, release or escape of pollutants." PCS therefore argues that version 1 of this exclusion does not bar coverage. Although "seepage" and "migration" ultimately occurred as described by PCS, the question is whether the property damage "arose out of" Ross's original "discharge" or "release" of "pollutants." Accordingly, liability for these subsequent effects of the original pollution is barred by the exclusion.

### iii. "Absolute" Pollution Exclusion (Version 2)

The policies issued in 1991 and 1992 contain an "absolute" pollution exclusion, referred to by the parties as "version 2," which excludes coverage for:

**f.** (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, *seepage, migration,* release or escape of pollutants:

(a) At or from premises*, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.*

(b) At or from any *premises,* site or location *which is or was at any time used by or for any insured or others* for the handling, storage, disposal, processing or treatment of waste; [or]

(c) Which are *or were* at any time transported, handled, stored, treated, disposed of, or processed as waste by or for *any insured* or any person or organization for whom you may be legally responsible; . . .

*(2) Any loss, cost, or expense arising out of any:*

(a) *Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or*

> *(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any responding to, or assessing the effects of pollutants.*
>
> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

ECF No. 208-29 at 7-8 (differences from version 1 emphasized in italics). This exclusion contains an exception stating that f.(1)(a) "do[es] not apply to bodily injury or property damage arising out of heat, smoke, or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be."

The parties concede that version 2 of the "absolute" pollution exclusion bars coverage relating to *Ashley II*.

### iv.     Conclusion

All of the policies at issue in this case contain one of the three pollution exclusions discussed above. As explained, all three pollution exclusions bar coverage for property damage caused by Ross's placement of pyrite slag into the ground at the Site. Accordingly, neither FFIC nor USFIC is required to indemnify Ross for any liability "because of" the placement of pyrite slag.

### C.     The 1963 Fire

Under the "qualified" pollution exclusion, property damage caused by the release of pollutants in an unintentional, unexpected fire would not be barred. Similarly, under the "absolute" pollution exclusions, property damage arising out of heat, smoke, or fumes from a hostile fire would not be barred. Ross argues that a 1963 fire that caused cPAH contamination at the Site was "sudden and accidental" and therefore not barred by the exclusion.

FFIC and USFIC do not contest that this fire was "sudden and accidental" as well as "hostile." However, the fire occurred in 1963, almost ten years before any of the insurance policies were in effect. The policies cover "sums that the insured becomes legally obligated to pay as damages *because of . . . property damage to which this insurance applies*." *See, e.g.*, ECF No. 208-29 at 6 (emphasis added). Furthermore, each policy "applies" only to property damage that takes place during the policy period. *Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 603 (S.C. 2011). For these reasons, the 1963 fire could trigger coverage only if it continued to cause new property damage during one or more of the policy periods between 1972 and 1992. As noted above, "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination in the soil and groundwater." *Olin*, 468 F.3d at 131. Furthermore, the policies would only cover liability "because of" this new property damage, not because of the original damage or pollution caused in 1963. Finally, as Ross and PCS acknowledge, the "alienated premises" exclusion in the policies bars coverage for damage to property formerly owned by Ross, including the Site. Accordingly, the 1963 fire cannot provide any basis for coverage unless it continued to cause damage to third-party property, such as groundwater, between 1972 and 1992.

Ross and PCS have not produced any evidence showing that cPAH contamination or any other contamination caused by the 1963 fire spread or migrated to third-party property between 1972 and 1992. Additionally, nothing in this court's second amended findings of fact in *Ashley II* suggests that such migration occurred. *See Ashley II*, 2:05-2782 (D.S.C.) (ECF No. 627). The fact that the cPAH contamination caused by the fire remained localized in two "hot spots" on the

Site decades after the fire suggests that this contamination did not spread throughout the Site. Even more importantly, no analysis of subsurface soil or groundwater revealed the presence of cPAHs.

Furthermore, even assuming that such migration did occur between 1972 and 1992, Ross's liability in *Ashley II* is in no sense "because of" the spreading of cPAHs. As this court found, the majority of the remediation at the Site is necessary because of arsenic contamination in the soil, most of which was caused by pyrite slag. "The remedy selected by EPA to clean up the contaminated soil and sediments at the Site involves excavation and off-site disposal. The volume of contaminated soil is directly related to how much the remediation is going to cost." *Ashley II*, 2:05-2782 (D.S.C.) (ECF No. 627 at 78). Dr. Brown, Ashley's expert witness who stated that the 1963 fire was the "major source" of cPAH contamination at the Site, also agreed that "the cPAH hot spot is within the area that's going to be cleaned up because of lead or arsenic anyway," and that it is "irrelevant to the cleanup plan" and "adds nothing to the cost of cleanup." *Id.* (ECF No. 545 at 204-05). Additionally, the cPAH contamination at the Site played no role in this court's analysis of the divisibility of harm or equitable allocation for remediation costs at the Site. There is no basis to conclude that Ross's liability is "because of" *any* cPAH contamination at the Site, including the hypothetical spreading of this contamination to third-party property between 1972 and 1992.

**D.    Conclusion**

As discussed above, because of the pollution exclusions, no policy provides coverage for liability arising from Ross's dumping of pyrite slag at the Site. Furthermore, although pollution caused by the 1963 fire would not be excluded, Ross's liability in *Ashley II* is not "because of"

property damage caused by this fire during any policy period between 1972 and 1992.  Neither

Ross nor PCS has identified any other potential trigger for coverage in *Ashley II*, and it appears

from the record that no other such trigger exists.  Accordingly, the court holds as a matter of law

that no policy at issue in this case provides coverage for Ross's liability in *Ashley II*.

## II.     FFIC's and USFIC's Duty to Defend

"The duty of a liability insurer to defend an action brought against the insured is

generally determined by the allegations in the complaint." *Liberty Life Ins. Co. v. Commercial*

*Union Ins. Co.*, 857 F.2d 945, 949 (4th Cir. 1988).  "If the facts alleged in the complaint raise a

reasonable possibility that the insured may be held liable for some act or omission covered by

the policy, then the insurer must defend." *Id.*  "If no such possibility is raised, no duty of

defense is owed." *Id.*  Generally, "whether a duty to defend exists is determined by comparing

the allegations of the complaint to the terms of the policy." *Id.* at 949-50.  However, "an

insurer's duty to defend is not strictly controlled by the allegations in the complaint." *City of*

*Hartsville v. S.C. Mun. Ins. & Risk Financing Fund*, 677 S.E.2d 574, 578 (S.C. 2009).  Rather,

"the duty to defend may also be determined by facts outside the complaint that are known by the

insurer." *Id.*

### A.     *Ashley II*

#### i.      Background

On September 26, 2005, Ashley II of Charleston, LLC ("Ashley"), the current owner of a

portion of the Site, filed an action against PCS seeking to recover environmental response costs

for the Site.  *Ashley II*, No. 2:05-2782 (D.S.C.) (ECF No. 1).  Ashley alleged that PCS's

predecessor "manufactured phosphate fertilizers and nitrogen-based fertilizer at the Site," and

"actively participated in, managed, supervised and was otherwise involved in operations at [the Site] at the time of disposal of hazardous substances." *Id.* at 5-6. Ashley alleged that PCS's predecessor owned the Site between 1966 and 1985 and "operated a phosphate fertilizer granulation plant and produced phosphate and nitrogen-based fertilizers at the Site until 1972." *Id.* at 6.

Ashley's complaint provided the following background:

17. The production of phosphate fertilizers involved producing sulfuric acid and mixing this acid with phosphate rock. Sulfuric acid was produced at the Site by burning sulfur in the presence of oxygen to form sulfur trioxide. Water was then passed over packing media to react with the sulfur trioxide gas to form sulfuric acid. Crushed phosphate rock was then mixed with the sulfuric acid, and was further mixed, solidified and cured, ultimately reaching a level of phosphate availability acceptable for fertilizer. The final product was then crushed and bagged for shipment.

18. Waste products generated by the phosphate fertilizer production process at the Site included air emissions of particulates, fluorides, ammonia, and sulfur oxides and wastewaters containing phosphates, fluorides, sulfates, and gypsum. Wash down waters containing acid and soluble lead were discharged onto the ground surface or into nearby drainage ditches. Solid wastes included pyrite cinders containing lead and arsenic and spent packing material, both of which were possibly used as fill material onsite.

19. The U.S. Environmental Protection Agency (EPA) has initiated remedial investigation/feasibility study ("RI/FS") activities for the Site. The RI/FS is the methodology authorized by CERCLA for characterizing the nature and extent of contamination and evaluating potential remedial options for risks to human health and the environment posed by uncontrolled hazardous waste sites.

. . .

20. Efforts to characterize the nature and extent of soil, groundwater, surface water, and sediment contamination at the Site were conducted during the RI/FS field activities conducted in May 1999, September and October 2000, and October 2001.

21. Analysis of the surface soil indicates elevated concentrations of the eight

RCRA metals and copper throughout. Hazardous substances were also detected at elevated concentrations in surface soil samples, including polynuclear aromatic hydrocarbons benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, and indeno(1,2,3-cd)pyrene and dieldrin. The subsurface soil included elevated concentrations of inorganic constituents including arsenic, barium, cadmium, chromium, copper, lead, mercury, selenium, and silver.

22. Groundwater analytical results were compared to the National Primary Drinking Water Standard Maximum Contaminant Levels ("MCL's"). The concentrations of several constituents which exceeded MCL's included arsenic, cadmium, chromium, copper and lead. Other inorganic constituents detected above MCL's or secondary MCL's in the most recent sampling events include aluminum, beryllium, iron, manganese, thallium, and zinc.

23. Analysis of surface water samples indicated elevated concentrations of several inorganic constituents, including arsenic, cadmium, copper, lead, nickel, and zinc. The sediment samples exhibited elevated concentrations of the same inorganic constituents, as well as mercury, chromium, antimony and silver. The sediment samples also contained multiple organics and pesticides SSVs: benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, fluoranthene, indeno(1,2,3-cd)pyrene, phenanthrene, pyrene, bis(2-ethylhexyl)phthalate, 4,4'-DDD, alpha-chlordane, dieldrin, and gamma-chlordane.

*Ashley II*, No. 2:05-2782 (D.S.C.) (ECF No. 1 at 6-8).

On January 19, 2007, PCS filed a third-party complaint against Ross and other parties, seeking contribution for response costs at the Site. *Ashley II* (ECF No. 91). PCS alleged that Ross, formerly known as Planters' Fertilizer and Phosphate Company, owned and operated and produced phosphate fertilizer at the Site from 1906 until 1966. *Id.* at 14. PCS alleged that "[d]uring the period of Ross's ownership and operation of [the Site] . . . there was a 'disposal' of 'hazardous substances' as those terms are defined under Section 101(14) and Section 101(29) of CERCLA, 42 U.S.C. §§ 9601(14) and (29)." *Id.* at 15. As background, PCS alleged:

11. Planters' production of phosphate fertilizers at [the Site] involved reacting

phosphate ores with sulfuric acid to produce phosphoric acid, the building
block of nitrogen-phosphate potassium (N-P-K) agricultural fertilizers.
The production process included two components: the production of
sulfuric acid using the lead acid chambers process, and the granulation,
bagging and storage of the fertilizer. During the early years of the
phosphate fertilizer industry, pyrite ore was used as the source of sulfur.
The pyrite ore was crushed and roasted, creating sulfur dioxide gas. The
sulfur dioxide gas was reacted with oxygen to create sulfur trioxide gas.
Sulfuric acid was produced as water flowing downward through a Glover
Tower came into contact with rising sulfur trioxide gas. The sulfuric acid
was stored on-site in large chambers insulated with sheet lead.
Environmental impacts EPA found associated with phosphate fertilizer
manufacturing facilities at [the Site] included elevated levels of metals,
particularly lead and arsenic in soil, groundwater, and sediment, as well as
acidic pH conditions.

*Id.* at 14-15.

Finally, although there was no allegation of pollution from the 1963 fire in the complaint

against Ross, Ross states that its counsel notified FFIC about the fire on October 13, 2008, the

day before FFIC stopped defending Ross. In this notification, Ross's counsel stated:

In preparation for tomorrow's mediation I reviewed the rebuttal expert report of
Ashley II, the plaintiff. Its expert identifies as one of the sources of contaminants
the fire in 1963 that burned down the Glover tower and parts of the plant. The
fire occurred at the time that your insured owned the property.

The FFIC policies for 1981-1987 contain an exception to the pollution exclusion
for sudden and accidental discharges. The fire would certainly come within the
exception to the exclusion.

ECF No. 210 at 19-20.

### ii. Policies With the "Qualified" Pollution Exclusion

### a. The complaint against Ross

The third-party complaint filed by PCS against Ross describes Ross's operation of a

fertilizer manufacturing plant, including the methods utilized to produce the fertilizer, and lists

the types of contaminants "associated with phosphate fertilizer manufacturing facilities" that had

been found at the Site. The complaint does not describe any "sudden and accidental" releases of pollutants at the Site or identify any pollutants found at the Site that could not be attributed to fertilizer manufacturing activities. Nothing in the complaint suggests that Ross's alleged liability was based on anything other than pollution that occurred in the course of its manufacturing activities. Without further information, the only reasonable assumption is that such pollution was either intentional or in the course of "routine business operations," *see Helena Chemical*, 594 S.E.2d at 460-62, and therefore excluded by the qualified pollution exclusion. Accordingly, the third-party complaint in itself raises no reasonable possibility that Ross would be held liable for property damage covered by the policies containing the qualified pollution exclusion.

Ross points out that in *Greenville County v. Insurance Reserve Fund*, 443 S.E.2d 552 (S.C. 1994), a case where the complaints "allege[d] contamination through dumping of hazardous waste and chemicals in [a] landfill," the South Carolina Supreme Court ultimately held that "the exception to the pollution exclusion applies" and that the insurer had a duty to defend. Ross would read this case to hold that insurers generally have a duty to defend cases alleging intentional pollution notwithstanding any policy exclusions for intentional pollution. The court disagrees. *Greenville County* was concerned with a single, narrow issue – whether the term "sudden" in the "sudden and accidental" pollution exclusion means "abrupt" or merely "unexpected." Neither the South Carolina Supreme Court nor the lower appellate court discussed or considered whether the pollution in that case was "accidental." Under South Carolina law, "an insurer has no duty to defend an insured where the damage was caused for a reason unambiguously excluded under the policy." *B.L.G. Enter., Inc. v. First Financial Ins.*

19

*Co.*, 514 S.E.2d 327, 330 (S.C. 1999). This court does not agree that *Greenville County*, without explanation or discussion, overruled this well-settled principle or carved out an exception pertaining to intentional pollution.

### b. Other facts known to the insurer

Prior to its refusal to defend, FFIC was informed by Ross that the 1963 fire had caused some of the contamination at the Site. Additionally, the initial complaint filed by Ashley against PCS in *Ashley II* stated that cPAHs had been found in surface soil and sediment at the Site. As this court found in *Ashley II*, this cPAH contamination was caused by the 1963 fire. Nonetheless, these facts do not raise a reasonable possibility that Ross would be held liable in *Ashley II* for covered property damage. The fire occurred nearly ten years before the earliest FFIC policy was in effect. As explained above, coverage would not be triggered unless this fire continued to cause new damage to third-party property, such as groundwater, between 1972 and 1992. Ross and PCS identify no other facts known to FFIC that would support a reasonable inference that such continuing damage to third-property occurred. The court finds that Ross's contention that the 1963 fire caused damage to third-party property between 1972 and 1992 is pure speculation.

### ii. Policies With the "Absolute" Pollution Exclusions

Although the third-party complaint filed by PCS against Ross allege that "hazardous substances" were "disposed of" at the Site, it does not specifically state that "waste" was disposed of. However, the initial complaint filed by Ashley against PCS alleged that:

> Waste products generated by the phosphate fertilizer production process at the
> Site included air emissions of particulates, fluorides, ammonia, and sulfur oxides
> and wastewaters containing phosphates, fluorides, sulfates, and gypsum. Wash
> down waters containing acid and soluble lead were discharged onto the ground

20

surface or into nearby drainage ditches.  Solid wastes included pyrite cinders containing lead and arsenic and spent packing material, both of which were possibly used as fill material onsite.

*Ashley II*, No. 2:05-2782 (D.S.C.) (ECF No. 1 at 7).  This establishes that the Site had been used by Ross or by others "for the handling, storage, disposal, processing or treatment of waste."  As explained above, the absolute pollution exclusions bar coverage for any property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" at any location "used by or for [Ross] or others for the handling, storage, disposal, processing or treatment of waste."  *See, e.g.*, ECF No. 210-2.  Furthermore, Ross's liability in *Ashley II* arises out of "the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" at the Site.  The facts known to FFIC at the time it denied coverage show that coverage of such liability was barred by the absolute pollution exclusion, and that there was accordingly no "reasonable possibility" that Ross would be held liable for property damage covered by the policies containing the absolute pollution exclusions.

### iii.    FFIC's Reason for Refusing to Defend

PCS notes that FFIC's refusal to defend under its owner, landlord, and tenant policies was based solely on its position that the Site was not an "insured premises" under these policies, a position PCS contends is erroneous.  PCS argues that FFIC acted in bad faith by refusing to defend on an erroneous ground, and that FFIC is in some way estopped from relying on other grounds to establish that it had no duty to defend.  PCS cites no authority in support of this argument.  PCS does provide some authority for the proposition that an insurer that breaches its duty to defend may be deemed to have waived any defenses to coverage if its refusal to defend was in bad faith.  But this does not suggest that an insurer who in fact had no duty to defend may

21

be liable for bad faith if it provides an incorrect reason for refusing to defend. In fact, *Newmont USA Limited v. American Home Assurance Co.*, 676 F. Supp. 2d 1146, 1164 (E.D. Wash. 2009), cited by PCS in support of its argument, states that "[b]ecause [one of the insurers] had no duty to defend, its refusal to do so could not have been unreasonable or in bad faith."

### iv.  Conclusion

Viewing the evidence in the light most favorable to Ross and PCS, the court finds that the complaint against Ross and other information known to FFIC and USFIC did not raise a reasonable possibility that Ross would be held liable in *Ashley II* for property damage covered under any of the policies at issue in this case. Accordingly, the court holds that a reasonable jury could not find that FFIC or USFIC breached the contractual duty to defend by refusing to defend Ross in *Ashley II*.

### B.  The Shareholder Action

On September 15, 2008, PCS filed an action in South Carolina state court against thirty-two individuals who had each owned at least 275 shares of Ross stock at some point between 1997 and 2006. *PCS Nitrogen, Inc. v. Buhrmaster* ("the shareholder action"); ECF No. 191-6 at 4-5. PCS alleged that "[d]uring this time–and extending back to 1983–Ross was in dissolution. In winding up its affairs, Ross disposed of real estate worth approximately $13.3 million and distributed monies received to its shareholders including the [defendants]. Together the[se] individuals . . . received approximately 80% of the assets that Ross distributed." *Id.* at 5. PCS maintained that if Ross were to be found liable to PCS for any costs associated with CERCLA liability at the Site but without assets, "the shareholders of Ross must contribute to [PCS] the assets distributed to them as part of Ross's liquidation pursuant to S.C. Code Ann. § 33-14-

107(d)(2)." *Id.* at 8.

Ross argues that FFIC and USFIC has a duty to defend its former shareholders in this action because the policies include Ross's shareholders as "insureds" "with respect to their liability as stockholders" or "while acting within the scope of [their] duties as such." *See, e.g.*, ECF No. 191-3 at 3; ECF No. 191-4 at 4. Ross argues further that this action "seeks to hold the former Ross shareholders liable for property damage in the form of environmental contamination which was caused by an occurrence"; specifically, for the exact damages sought in *Ashley II*. ECF No. 211 at 19. However, assuming the court accepts Ross's characterization, there would be no duty to defend the shareholder action for the same reason there is no duty to defend or indemnify in *Ashley II* – because the damages sought in *Ashley II* are not "because of" property damage covered by the policies. The court holds as a matter of law that neither FFIC nor USFIC breached its contractual duty to defend Ross in the shareholder action.

### C.      The Fraudulent Conveyance Action

On December 8, 2009, PCS filed an action in this court against six individuals who were directors of Ross between 1992 and 2006. *PCS v. Ross*, 3:09-3171 (D.S.C.) ("the fraudulent conveyance action") (ECF No. 1). PCS alleged that between 1992 and 2006, the defendants had distributed over $5.7 million dollars of Ross's assets to its shareholders with the intent of avoiding Ross's environmental liabilities. PCS asserted claims for civil conspiracy and breach of fiduciary duty against these defendants and sought to set aside the assets distributions as fraudulent conveyances. On October 21, 2010, PCS filed an amended complaint including as defendants sixteen Ross shareholders who allegedly received the fraudulent conveyances and adding a claim for equitable indemnification against the former Ross directors. *Id.* (ECF No.

34); ECF No. 190-6.

As with the shareholder action, Ross argues that the duty to defend this action is triggered because it seeks to hold Ross directors and shareholders liable for the judgment obtained in *Ashley II*. As explained above, absent a duty to defend or indemnify in *Ashley II*, neither Ross nor PCS has presented any argument as to how the shareholder action or the fraudulent conveyance actions present any reasonable possibility that Ross's shareholders and directors could be held liable for property damage covered under the policies. The court holds as a matter of law that neither FFIC nor USFIC breached its contractual duty to defend Ross in the fraudulent conveyance action.

### III.    Remaining Motions

USFIC filed a motion for summary judgment as to liability under an alleged policy number 5203635579, arguing that Ross and PCS are unable to prove the existence or terms of such a policy. ECF No. 189. Neither Ross nor PCS opposes this motion, and the court accordingly grants the motion. Ross filed a motion for partial summary judgment, seeking a declaration that based on several owner, landlord, and tenant policies, FFIC had a duty to defend Ross, its former directors, and its former shareholders in the three lawsuits discussed above. ECF No. 195. Because the court has found that FFIC had no duty to defend in any of these cases, Ross's motion is denied. FFIC filed a motion for partial summary judgment, seeking a declaration that the "owned property" and "alienated property" policy exclusions bar coverage for all costs incurred to remediate contaminated soil at the Site that is not causing damage to third-party property. ECF No. 192. Because the court has found that the policies do not cover Ross's liability in *Ashley II*, this motion is denied as moot. Finally, FFIC and USFIC filed

motions for partial summary judgment dealing with allocation of liability in *Ashley II* among multiple insurance policies. ECF No. 144; ECF No. 157. Because the court has found that the policies do not cover Ross's liability in *Ashley II*, these motions are denied as moot.

## CONCLUSION

FFIC's motion for summary judgment based on the pollution exclusions (ECF No. 193) is granted. FFIC's motions for summary judgment as to the shareholder action and the fraudulent conveyance action (ECF Nos. 190 & 191) are granted. USFIC's motion for summary judgment as to the shareholder action and the fraudulent conveyance action (ECF No. 194) is granted. USFIC's motion for summary judgment as to policy number 5203635579 (ECF No. 189) is granted. Ross's motion for partial summary judgment (ECF No. 195) is denied. FFIC's motion for partial summary judgment based on the "owned premises" and "alienated premises" exclusions (ECF No. 192) is denied as moot. FFIC's and USFIC's motions for partial summary judgment as to allocation (ECF Nos. 144 & 157) are denied as moot.

Judgment is entered in favor of FFIC and USFIC on all of Ross's claims and PCS's cross-claims.

**IT IS SO ORDERED**.

　　　　　　　　　　 s/ Margaret B. Seymour　　　　
　　　　　　　　　 Margaret B. Seymour
　　　　　　　　　 Chief United States District Judge

Columbia, South Carolina
November 15, 2012

Nunc pro tunc date: August 10, 2012

25